UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    X

STEPHEN HURN, PETER SENATORE, MARIANNE
AGNELLO, DIANNE MONDELLO,
MICHAEL LEONARD, DANIEL RICE and
TOM SPARKS, on behalf of themselves and all persons
similarly situated,

                PLAINTIFFS,

- vs –

The HOLY SEE, a/k/a the APOSTOLIC SEE,

                Defendant.                    X

CASE NO.:

**CLASS ACTION
COMPLAINT**

PLAINTIFFS STEPHEN HURN, PETER SENATORE, MARIANNE AGNELLO, DIANNE MONDELLO, MICHAEL LEONARD, DANIEL RICE and TOM SPARKS (collectively "PLAINTIFFS"), on behalf of themselves and all others similarly situated (the "CLASS"), by their attorneys, HERMAN LAW, as and for their Class Action Complaint against DEFENDANT, the HOLY SEE, allege as follows:

### INTRODUCTION

1. This is a class action lawsuit against the HOLY SEE for victims of childhood clergy sexual abuse who previously settled claims against Catholic Dioceses in the State of New York.

2. This class action seeks money damages for the negligence of the HOLY SEE in mandating a policy for its Bishops and Dioceses of secrecy and concealment in response to allegations and reports of child sexual abuse by Catholic clergy. This mandatory secrecy policy, imposed on threat of excommunication, bound Bishops and Dioceses for well over a century and continues to bind them. As a result of this policy, child sexual abuse by Catholic clergy developed and continued as a pervasive and systemic problem in the Catholic Church, in which perpetrators



were protected and victims were silenced.  The Bishops' and Dioceses' adherence to this policy created a foreseeable risk of clergy sexual abuse from the failure to warn or disclose the known danger of sexual predator clergy.

3. The PLAINTIFFS and the members of the putative CLASS are victims of clergy sexual abuse who are eligible to bring claims under the New York Child Victims Act, C.P.L.R. § 214-g, and who previously settled claims against the responsible Dioceses in claims settlement programs instituted by the Dioceses.  The claims asserted in this Complaint are for money damages against the HOLY SEE, which, upon information and belief, were not released in the settlements of claims against the Dioceses.

## PARTIES, JURISDICTION AND VENUE

4. PLAINTIFF STEPHEN HURN is an adult male, age 66, citizen of North Carolina. Plaintiff was sexually abused when he was approximately 16 years old, in or about 1969 by Father Edward Humphrey, who was assigned to St. Anthony of Padua within the Diocese of Syracuse.

5. PLAINTIFF PETER SENATORE is an adult male, age 48, citizen of New York. Plaintiff was sexually abused when he was approximately 14 years old, in or about 1985 through 1986 by Father Frank Capellupo, who was assigned to Most Precious Blood Church within the Diocese of Brooklyn.

6. PLAINTIFF MARIANNE AGNELLO is an adult female, age 62, citizen of New York.  Plaintiff was sexually abused when she was approximately 11-12 years old, in or about 1968 by Father Edward Brennan, who was assigned to Good Shepherd Church within the Diocese of Brooklyn.

7. PLAINTIFF DIANNE MONDELLO is an adult female, age 61, citizen of New York.  Plaintiff was sexually abused when she was approximately 10 years old, in or about 1968

by Father Edward Brennan, who was assigned to Good Shepherd Church within the Diocese of Brooklyn.

8. PLAINTIFF MICHAEL LEONARD is an adult male, age 64, citizen of California. Plaintiff was sexually abused when he was approximately 10-11 years old, in or about 1965-1967 by Father George Reinheimer and Father Ed Roose, who were assigned to Our Lady of Refuge in the Bronx, New York within the Archdiocese of New York.

9. PLAINTIFF DANIEL RICE is an adult male, age 52, citizen of New York. Plaintiff was sexually abused when he was approximately 14-15 years old, in or about 1981-1982 by Deacon Joseph Weckbach, who was assigned to St. Clare of Assisi Church within the Archdiocese of New York.

10. PLAINTIFF TOM SPARKS is an adult male, age 52, citizen of New York. Plaintiff was sexually abused when he was approximately 9 years old, in or about 1976 by Father Tom Squires, who was assigned to St. Alphonsus Church within the Diocese of Ogdensburg.

11. Defendant the HOLY SEE a/k/a the APOSTOLIC SEE (the "HOLY SEE") is an agency or instrumentality of a foreign state, the Vatican City State, a sovereign territory located within the city of Rome, Italy. The HOLY SEE is the government of the Catholic Church worldwide. It is a separate entity which serves as an organ of the Vatican City State. The HOLY SEE is a citizen or subject of the Vatican City State.

12. The Court has jurisdiction over this action pursuant 28 U.S.C. § 1332(a)(2) as this is an action between citizens of a state and a citizen or subject of a foreign state in which the matter in controversy exceeds $75,000.

13. The Court alternatively has original and personal jurisdiction pursuant to 28 U.S.C. § 1330, as PLAINTIFFS assert claims for relief in personam for which the Defendant is a foreign



state as defined in 28 U.S.C. § 1603(a) and (b), and is not entitled to immunity under 28 U.S.C. §§ 1605-1607 nor under any applicable international agreement.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c)(3) as the Defendant is not resident in the United States, or alternatively pursuant to 28 U.S.C. §§ 1330(b) and 1391(b)(3) as the Defendant is subject to personal jurisdiction in this district, or alternatively pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in this district.

## ALLEGATIONS SUPPORTING CLAIMS

### A. Agency Relationship Between Defendant HOLY SEE and Catholic Bishops

15. The Papacy, or the office of the Pope, known as the Supreme Pontiff, operates and controls the HOLY SEE. The Pope is assisted in the administration of the HOLY SEE and the world-wide Roman Catholic Church by the Roman Curia, which is the administrative headquarters of the HOLY SEE.

16. The HOLY SEE and the Vatican City State are unique and atypical entities. The HOLY SEE runs, directs, supervises and oversees the business, activities, organizations and employees of the worldwide Roman Catholic Church. The HOLY SEE, as an instrumentality of the Vatican City State, maintains diplomatic relations and enters into treaties and agreements with other nation states, including the United States.

17. The HOLY SEE is governed as a hierarchy, wherein all power and control in the governmental system descends from the top, the office of the Pope, downward. In the HOLY SEE, executive, legislative and judicial authority is concentrated in the office of the Pope. The Pope has "full and supreme power in the [Catholic] Church." (Canon 218, 1917 Code and Canon 331 of the revised 1983 Code). The Pope has the right to control and is the supreme and ultimate authority

for all decision making concerning the HOLY SEE and the activities of the worldwide Catholic Church. The Pope answers to and is judged by no human power (Canon 1404 of the 1983 Code).

18.     The Catholic Church is divided into geographic territories or sections it identifies as dioceses and archdioceses. The dioceses are operated by bishops. An archdiocese is a primary diocese in a region identified as a province, headed by an archbishop. An archbishop holds a position of honor among bishops of dioceses, but his position is parallel to that of the diocesean bishops in that an archbishop does not exercise authority over a bishop. Archbishops and bishops, also known as Ordinaries, have authority to conduct the activities of the Catholic Church in their respective territories (herein dioceses and archdioceses are collectively referred to as "Dioceses," and bishops and archbishops are collectively referred to as "Bishops").

19.     The HOLY SEE has substantial involvement in, and the unqualified right to, control the day-to-day business and operations of its agents and instrumentalities, including the conduct of Diocesan activities by Bishops.

20.     The HOLY SEE operates in part from funds raised by Dioceses for its sole benefit, which is a major source of revenue. The Dioceses are obligated to provide funds to support the HOLY SEE (Canon 1271 of the 1983 Code), which funds are provided by the donations of members and parishioners in the Dioceses. Fundraising for the HOLY SEE is accomplished, for example, through a program known as Peter's Pence, which is coordinated between the HOLY SEE and Bishops, among other agents of the HOLY SEE.

21.     The HOLY SEE operates a charitable organization, the Pontifical Society for the Propagation of the Faith, which operates in each Diocese and raises funds for the Catholic Church's worldwide missionary work, among other things. Funds donated to the Society for the Propagation

of the Faith are sent to the Pontifical Mission Societies in the United States, headquartered in New York City.

22. A Diocese is created by the Pope. No other official or body in the Catholic Church has this authority.

23. A Bishop is appointed by the Pope. No other official or body in the Catholic Church has this authority.

24. The Pope is the supreme legislator of the Catholic Church, including its Dioceses. The Pope alone has the authority to enact laws and interpret laws governing the Church and its activities. While a Bishop has authority to legislate within the territory of a Diocese, this authority is limited by the Pope and must be consistent with any papal policy statements. Papal policy statements are distributed by the office of the Pope to the Bishops, who are responsible for implementing them and communicating them to the Catholic faithful or directing that they be maintained in secrecy.

25. The Pope is also the supreme administrator of all Church property, including property that is nominally in the name of a Diocese or entity created by a Diocese.

26. The Pope is the direct supervisor of Bishops in the Church hierarchy. Only the Pope has the authority to select, consecrate or ordain a Bishop, assign a Bishop to a Diocese, transfer a Bishop, remove a Bishop from office, or accept a Bishop's resignation. The Pope alone determines the specific requirements for serving as a Bishop. The office of Bishop does not exist independently from the HOLY SEE, nor does it have any meaning outside of the structure and hierarchy of the Catholic Church. A Bishop is entirely dependent upon the Pope for the exercise of the Bishop's power and authority in his Diocese. The Pope determines the extent and limits of a Bishop's authority and establishes the relationship of Bishops to the Papacy.

27. A Bishop of a Diocese is required to submit detailed reports concerning the Diocese to the HOLY SEE every five years, known as Quinquennial Reports. This Report is presented to the Pope in a mandatory official visit by the Bishop to the Vatican. A Bishop is otherwise required to send reports and other information concerning the activities or business of the Diocese to the HOLY SEE on demand.

28. The Pope requires that a Bishop take the "Oath of Fidelity" to the HOLY SEE. As the name indicates, the Oath is a promise of total fidelity to the Pope. The failure to comply with the Oath would be a basis for the Pope to use his authority to remove the Bishop.

29. The three primary roles of authority in the Church are Deacons, Priests and Bishops. Deacons and Priests are approved for ministry and are "ordained," which is the educational and ceremonial process by which individuals become Deacons and Priests. The office of the Bishop is the highest of what are known as "holy orders." The Bishop is selected, appointed and assigned only by the Pope. A Bishop is the superior of all Priests and other clergy assigned to work within his Diocese. This includes Priests ordained in the Diocese, Priests of a Catholic religious order, and Priests from other Dioceses working in the Diocese.

30. The HOLY SEE has ultimate authority in the investigation and response to allegations of child sexual abuse by Catholic Priests. A Bishop has authority conferred by the Pope to respond to such allegations, subject to the Pope's right to intervene directly in personnel matters concerning any Catholic clergy, including Diocesan and religious order Priests working in the territory of a Diocese. The office of the Pope promulgates and officially publishes rules, included in the Code of Canon Law, that pertain to the investigation and response to reports of sexual abuse. The application of these rules is not optional but mandatory for all Bishops.

**B.     The Mandatory Secrecy Policy of the HOLY SEE**

31.     The HOLY SEE has known for centuries that Catholic priests were using their positions and roles in Catholic parishes and schools to sexually molest children.  At all relevant times, this was a widespread, ubiquitous and systemic problem in the Catholic Church.

32.     The first formal legislations referring to sexual abuse by clerics dates from the Synod of Elvira which took place in the year 309.  In the 11th century, St. Peter Damien composed a book, Liber Gomorrhianus (Book of Gommorah), addressed to then Pope Leo IX.  The book is a denunciation against sexual immorality in the Church.  It condemns as epidemic among clerics in the Church "sodomy," which encompasses acts of sexual abuse of boys and adolescents.  It advocates for the enforcement of severe punishment of the offending clerics, including public humiliation, required fasting, imprisonment in a monastic cell, and custody of the cleric by two monks to prevent future child sexual abuse offenses.

33.     The problem of child sexual abuse in the Church nonetheless has continued for centuries, prompting the issuance of policies and standards dictating how Bishops were to respond to allegations of child sexual abuse by Catholic clergy.  In 1866 the HOLY SEE issued express instructions to Bishops requiring strict secrecy and perpetual silence concerning allegations of child sexual abuse.  These instructions applied to all individuals in the Church having or acquiring knowledge of allegations of child sexual abuse under the penalty of excommunication.  This instruction was reiterated and developed in further detail in documents issued by the HOLY SEE in 1922, 1962, 2001 and 2010.

34.     In 1922, the HOLY SEE released a confidential document to Bishops and other Church officials regarding the handling of cases of solicitation of sex in the confessional and other

offenses by clergy. This document mandated a specific procedure for the Bishop to follow, bound by the requirement of strict secrecy.

35. The official name of this confidential document is the *Instruction on The Manner of Proceeding in Cases of Solicitation* (The Vatican Press, 1922) (hereinafter referred to as "Crimen Sollicitationis". The heading of the document states, "From the Supreme and Holy Congregation of the Holy Office To All Patriarchs, Archbishops, Bishops and Other Diocesan Ordinaries . . . ." It contains specific instructions regarding the handling of child sex abuse by clergy. According to the document itself, it is an "instruction, ordering upon those to whom it pertains to keep and observe it in the minutest detail." Crimen Sollicitationis, ¶ 11. It sets forth the following secrecy requirement:

> What is treated in these cases has to have a greater degree of care and observance so that those same matters be pursued in a most secretive way, and, after they have been defined and given over to execution, they are to be restrained by a perpetual silence. (Instruction of the Holy Office, February 20, 1867, n. 14). Each and everyone pertaining to the tribunal in any way or admitted to knowledge of the matters because of their office, is to observe the strictest secret, which is commonly regarded as a secret of the Holy Office, in all matters and with all persons, under the penalty of excommunication *latae sententiae,* ipso facto and without any declaration [of such a penalty] having been incurred and reserved to the sole person of the Supreme Pontiff, even to the exclusion of the Sacred Penitentiary, are bound to observe [this secrecy] inviolably.

Crimen Sollicitationis, ¶ 11. This same document was reissued in substantially the same form by the HOLY SEE on March 16, 1962.

36. While the title of the 1922 and 1962 documents refers only to solicitation of sex in the confessional, the scope of these documents actually encompasses four separately and distinct offenses: (1) solicitation of sex in the sacramental confession; (2) homosexual sex; (3) sexual abuse of minors; and (4) bestiality.



37. The HOLY SEE's mandatory policy of secrecy under penalty of immediate removal from the Church (excommunication) applies to all those involved in any way with the investigation or processing of a complaint of sexual abuse under the 1922 and 1962 documents. The penalty of automatic excommunication applies to all clerics involved. This penalty may also be imposed on lay persons involved in a case. The grave obligation of absolute and perpetual secrecy applies to all. Through this policy and others, implemented by the Bishops, the HOLY SEE condoned and enabled child sex abuse by Catholic clergy working in the territory of a Diocese.

38. Crimen Sollicitationis reflected a specific procedure and policy that Bishops were required to follow without material discretion, on penalty of excommunication. Compliance with this secrecy policy mandated, among other things, that Bishops (i) not disclose allegations of clergy sexual abuse to law enforcement; (ii) direct victims and their families to not report incidents of clergy sexual abuse to law enforcement; and (iii) provide no warning or disclosure that may protect other Catholic parishioners and students from sexual abuse. The HOLY SEE's secrecy policy mandated that the Bishop follow a specific course of action in response to an allegation of child sexual abuse.

39. The policy of secrecy and the severest of penalties for its violation set forth in Crimen Sollicitationis were reiterated in subsequent documents issued by the HOLY SEE to its Bishops in 2001 and 2010. The policy provided that an office of the HOLY SEE, the Congregation for the Doctrine of the Faith, was authorized to act in cases of child sexual abuse by ordained clergy. Under the 2001 policy, Bishops are required to report any priest accused of sexual misconduct to this office of the HOLY SEE.

40. The HOLY SEE has the right to control the organizational body of U.S. Bishops, known as the U.S. Conference of Catholic Bishops (USCCB). Upon information and belief, policy or legislation proposed by the USCCB is subject to approval by the HOLY SEE, particularly that concerning the handling of allegations of clergy sex abuse. In 2018, the HOLY SEE directed that the USCCB table a proposal the USCCB was prepared to vote on and approve that would have established standards for clergy conduct and a process for the evaluation of Bishops in complying with these standards. In May 2019, the Pope issued a Motu Proprio, i.e., a worldwide order to Bishops and other Church officials, which set forth standards and procedures for response to allegations of clergy sex abuse. The Bishops of the USCCB are required to comply with the Motu Proprio.

41. At all relevant times, the Dioceses' acts and omissions were subject to the HOLY SEE'S direction and control. Specifically, the HOLY SEE had the right to direct the Bishops how to respond to an allegation or report of clergy sexual abuse of a child. As demonstrated by the above-described policy statements, the HOLY SEE did so direct the Bishops to respond by maintaining the strict secrecy of the allegations under penalty of removal and excommunication.

**C.   Non-Immunity of Agent or Instrumentality of a Foreign State Under 28 U.S.C. § 1605(a)**

42. This action is for money damages sought against an agency or instrumentality of a foreign state, the HOLY SEE, for personal injuries occurring in the United States.

43. The personal injuries of PLAINTIFFS and the CLASS claimed herein were caused by the tortious acts or omissions of the Bishops, who at all relevant times were officials of the HOLY SEE. Alternatively, the Bishops were at all relevant times employees of the HOLY SEE under New York law because they performed services in the affairs of the HOLY SEE, and the conduct of their performance of such services was subject to the HOLY SEE's control or right of



control. At all relevant times, the Bishops were acting within the scope of their office or employment.

44. The claim for relief set forth herein is based upon the exercise or performance of mandatory duties or functions required of the Bishops by the HOLY SEE. In particular, the HOLY SEE imposed mandatory policies that required the Bishops to maintain the strict secrecy of allegations and reports of clergy sex abuse. The Bishops had no discretion to deviate from this secrecy policy and were forbidden by the HOLY SEE from disclosing or reporting clergy sex abuse.

45. The Bishops' response to allegations or reports of child sexual abuse by clergy had no element of independent decision making or considerations of public policy or morals. The Bishops were forbidden from taking actions or making decisions in noncompliance with the secrecy mandates of the HOLY SEE.

46. The HOLY SEE's secrecy policy enabled and emboldened child sexual predators among clergy working in the Dioceses, creating an environment and system which they could engage in child sexual abuse with impunity. As a result, children encountering clergy in the Dioceses were placed at foreseeable risk of child sexual abuse by clergy sexual predators.

**D.    The New York Dioceses' Compensation Programs**

47. Each of the Dioceses located in the State of New York instituted programs or plans in which victims of child sexual abuse by clergy could make claims and receive some compensation for their damages.

48. In 2016, the Archdiocese of New York announced the launch of its Independent Reconciliation and Compensation Program (IRCP), directed toward the numerous victims of child sexual abuse by clergy working within its territory. The Archdiocese appointed third-party

Administrators for the IRCP, Kenneth R. Feinberg and Camille S. Biros.  Under the IRCP, victims submitted claims to the Administrators.  The claims were investigated and, as to the PLAINTIFFS and members of the CLASS, offers were made by the Administrators for settlement of the claims.

49. Essentially the same IRCP was instituted by each of the Diocese of Brooklyn, Diocese of Rockville Centre, Diocese of Syracuse and Diocese of Ogdensburg.  As with the Archdiocese of New York, the IRCPs for these Dioceses were administered by Kenneth R. Feinberg and Camille S. Biros.

50. The Diocese of Buffalo initiated an IRCP in 2018, administered by former state court Judges.   The Diocese of Albany began a compensation program in 2004.  The Diocese of Rochester also instituted its own compensation program in 2018.

51. In all of the IRCPs and compensation programs, the Diocese's objective was to obtain releases from victims of clergy sexual abuse preventing them from bringing their claims in court.  The settlements required that the victim execute a release in favor of the Diocese and its agents in exchange for the compensation being paid.

52. The IRCPs and other compensation programs instituted by the Dioceses located in the State of New York were a response to legislative initiatives in New York State that would revive claims for child sexual abuse that had been barred by the expiration of the statute of limitations.  The programs were designed to settle claims at a substantial discount on the premise that the claims would remain barred by the statute of limitations and the victims had no recourse to file their claims in court.

53. The settlement programs were successful in securing releases from victims of clergy sexual abuse in favor of the Dioceses in the State of New York.  Upon information and

belief, at least 1,300 victims of clergy sex abuse have executed such releases, receiving approximately $250 million on their claims.

54. Given the purpose and intent of the settlement programs, the victims of child sexual abuse settling their claims in these programs received only a small fraction of the damages to which they would have been entitled in a court of law.

55. Upon information and belief, the releases executed by each of the Plaintiff and members of the CLASS do not release the Defendant HOLY SEE.

### E.     Nature of Conduct Causing Injuries to PLAINTIFFS and the CLASS

56. PLAINTIFFS and the members of the CLASS all suffered physical, psychological and emotional injuries as a result of conduct which constitutes a sexual offense on a minor as defined in Article 130 of the New York Penal Law, including without limitation, conduct constituting rape (consisting of sexual intercourse) (N.Y. Penal Law §§ 130.25 – 130.35); criminal sexual act (consisting of oral or anal sexual conduct) (N.Y. Penal Law §§ 130.40 – 130.53), and/or sexual abuse (consisting of sexual contact) (N.Y. Penal Law §§ 130.55 – 130.77).

55. The PLAINTIFFS and the CLASS all have claims for negligence set forth herein that were previously time barred and qualify for the revival of the statute of limitations pursuant to Section 214-g of the New York Civil Practice Law and Rules, effective August 14, 2019.  These claims are timely filed within the window of § 214-g.

### CLASS ACTION ALLEGATIONS

57. This action is brought and may properly be maintained as a class action under the provisions of Rule 23(b)(3) of the Federal Rules of Civil Procedure.

58. The putative CLASS is defined as (i) victims-survivors of childhood sexual abuse by Catholic clergy within the State of New York in the territories of the Archdiocese of New York,

Diocese of Brooklyn, Diocese of Rockville Centre, Diocese of Albany, Diocese of Rochester, Diocese of Syracuse, Diocese of Buffalo and Diocese of Ogdensburg, who (ii) entered into monetary settlements of claims in an IRCP or other victim compensation program, received monetary compensation, and executed releases of the paying Diocese.

59. The members of this putative CLASS are so numerous that separate actions or joinder of parties, whether required or permitted, is impracticable.

60. There are questions of law and fact common to the CLASS that predominate over any questions affecting only individual members of the CLASS. These include the scope of the agency relationship between the HOLY SEE and the Dioceses; the HOLY SEE's actual control and right to control the operations and activities of the Bishops and Dioceses; whether the Bishops are officials or employees of the HOLY SEE under principles of New York law; whether the policies and directives issued by the HOLY SEE are required to be followed by the Bishops and their Dioceses; whether the secrecy policy issued by the HOLY SEE, reflected, for example, in the 1922 and 1962 documents, was a mandatory policy required to be followed by the Bishops and the Dioceses; whether the Bishops had discretion to give notice, warning or disclosure of allegations of child sexual abuse against clergy working in their Dioceses with access to children; whether the Bishops had a duty to warn or disclose allegations of child sexual abuse against clergy working in their Dioceses with access to children; whether the Bishops breached this duty to warn or disclose, as agents or employees of the HOLY SEE, by following the mandatory policy of the HOLY SEE; whether the resulting secrecy surrounding reports and allegations of child sexual abuse by Catholic clergy perpetuated an environment and system in which child sexual abuse by clergy could be committed without adverse consequence to the perpetrators; whether clergy sexual abuse of children was condoned and enabled by the shroud of secrecy created by the HOLY SEE



policy; and whether the HOLY SEE'S secrecy policy was thus a substantial factor in causing the child sexual abuse of the PLAINTIFFS and the CLASS.

61. The claims of PLAINTIFFS are typical of the claims of the CLASS, in that they were all sexually abused as children by Catholic clergy in the State of New York; they all presented claims to IRCP or other compensation programs instituted by the respective Dioceses; they all received some monetary compensation on their claims which were premised on the compensation program being their only recourse because their claims had expired under the statute of limitations then in effect; they all executed releases in substantially the same form which released the Diocese but did not release the HOLY SEE; and they all have claims that qualify under the revival statute, Section 214-g of the Civil Practice Law and Rules, which allow their claims against the HOLY SEE to be filed and prosecuted at this time.

62. A class action is superior to other available methods for the fair, just, and efficient adjudication of the claims asserted herein. Joinder of all the members of the CLASS is impracticable and it would be impractical for individual members of the CLASS to pursue separate claims. At the same time, the CLASS members, while numerous, are identifiable as they each submitted and released claims in claims settlement programs instituted by the Dioceses. Moreover, prosecution of separate actions by individual members of the CLASS would create the risk of varying and inconsistent adjudications and would unduly burden the courts.

63. Given the costs of service and individual litigation, and the complexity associated with a claim subject to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605, multiple individual actions face significant barriers that would generally leave CLASS members without a remedy against the HOLY SEE, and would thus deny them the opportunity to obtain the full measure of their damages arising from child sexual abuse. A CLASS action is an efficient device

for litigating these claims, as it will conserve the resources of the courts and the parties.

64. PLAINTIFFS have no interest antagonistic to the interests of the other members of the CLASS with respect to this action or the claims for relief herein.

65. PLAINTIFFS are committed to the vigorous prosecution of this action and have retained competent legal counsel.

66. HERMAN LAW is experienced in group/class claims and the representation of victims-survivors of childhood sexual abuse.

67. HERMAN LAW devotes its practice to the representation of victims of sexual abuse in civil claims. It has represented over 1,000 victims of sexual abuse in civil cases. HERMAN LAW has experience representing substantial groups of victims in clergy sexual abuse cases against entities of the Roman Catholic Church.

68. PLAINTIFFS are adequate representatives of the CLASS and, together with their attorneys, are able to, and will fairly and adequately, protect the interests of the CLASS.

69. PLAINTIFFS and their counsel anticipate no difficulty in the management of this litigation as a class action.

**CLAIM FOR RELIEF**
**Negligence - Failure to Warn**

70. PLAINTIFFS and the CLASS repeat and reallege the allegations made in paragraphs 1 through 69 above.

71. At all relevant times, the HOLY SEE owed a duty to PLAINTIFFS and the CLASS, who were among the Catholic faithful receiving ministry, pastoral and educational services from clergy of the Dioceses. The HOLY SEE, through the Bishops and its Dioceses, was in a special relationship with PLAINTIFFS and the CLASS, and thus owed a duty to protect the child PLAINTIFFS and CLASS members from foreseeable harms.

72. The HOLY SEE and the Bishops were aware that a significant percentage of clergy were sexual predators molesting children. By mandating secrecy in response to allegations of reports of child sexual abuse, the HOLY SEE through the Bishops created and fostered a child sex ring in the Church.

73. The sexual abuse of PLAINTIFFS and the CLASS was within the category of foreseeable hazards resulting from the HOLY SEE's mandated policy of secrecy in response to allegations of clergy sexual abuse. The secrecy of allegations of child sexual abuse against predator clergy created the risk that other children engaged in activities in the Church and exposed to predator clergy would be sexually abused.

74. At all relevant times, the HOLY SEE knew or should have known that its strict secrecy policy and the failure to warn of the risk of clergy sex abuse to children would result in children having contacts with Catholic clergy being sexually abused.

75. The HOLY SEE breached its duty of care to PLAINTIFFS and the CLASS by instituting a policy of strict secrecy, with draconian consequences for its violation, preventing the Bishops from (i) warning the children and parents receiving the services of Catholic clergy and engaging in contacts with Catholic clergy of the foreseeable risk of child sexual abuse from such contacts; and (ii) reporting or disclosing clergy sexual abuse of children to third parties, parents or others in a position to act to protect children from clergy sexual abuse.

76. The HOLY SEE's breach of duty was a substantial factor in causing the clergy sexual abuse of PLAINTIFFS and the CLASS, resulting in injuries to PLAINTIFFS and the CLASS.

77. As a direct and proximate result of the HOLY SEE's negligence, Plaintiff and the CLASS members have each suffered and continue to suffer severe and permanent psychological,

emotional and physical injuries, shame, humiliation and the inability to lead a normal life.

78.     The HOLY SEE's acts and omissions shows a reckless or willful disregard for the safety and well-being of children in the Catholic Church who were exposed to its clergy.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS respectfully request certification of one or more defined classes in accordance with Fed.R.Civ.P. 23(c); judgment for compensatory damages in favor of PLAINTIFFS and the CLASS; an award of attorney's fees and costs pursuant to Fed. R. Civ. P. 23(h) and Rule 909 of the New York Civil Practice Law and Rules; an award of punitive damages; and such other and further relief as is just and proper.

**DEMAND FOR JURY TRIAL**

PLAINTIFFS demand a jury trial as to all claims so triable.

Dated: New York, NY
December 17, 2019

Respectfully submitted,

HERMAN LAW

By:   */s/ Stuart S. Mermelstein*
Jeff Herman
jherman@hermanlaw.com
*(Pending Admission)*
Stuart S. Mermelstein
smermelstein@hermanlaw.com
Daniel G. Ellis
dellis@hermanlaw.com
434 W. 33rd St., Penthouse
New York, NY 10001
Telephone: (212) 390-0100

- and –

1800 N. Military Trail
Suite 160
Boca Raton, FL  33431
Telephone:  (305) 931-2200

